IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| LAURA M. MCPHERSON, Individually and as Administrator of the Estate of Bobby L. McPherson, Deceased; and ESTATE OF BOBBY L. MCPHERSON, Deceased, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 1:11CV666 |
| MINNESOTA LIFE INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

This action comes before the undersigned United States Magistrate Judge for a recommended ruling on Defendant's Motion for Summary Judgment (Docket Entry 18). (See Docket Entry dated Nov. 2, 2012; see also Docket Entries dated Aug. 31, 2011, and Sept. 30, 2011 (referring case to Amended Standing Order 30 and assigning case to undersigned United States Magistrate Judge, respectively).) For the reasons that follow, the Court should grant Defendant's instant Motion.

BACKGROUND

The instant dispute arises out of the alleged non-payment of insurance benefits after the accidental death of Bobby McPherson. (See Docket Entry 3, ¶¶ 1-8.) In late 2006, SunTrust Mortgage, Inc. ("SunTrust"), Mr. McPherson's original mortgage lender and servicer, sent Mr. McPherson a letter announcing a mortgage accidental death insurance program underwritten by Minnesota Life

Insurance Company ("Minnesota Life"). (See id. ¶ 4; Docket Entry 22-1 at 14.)[1] The description of the insurance included with that letter states: "This insurance will pay for your family's home mortgage – up to $200,000 – if you die as the result of a covered accidental injury." (Docket Entry 22-1 at 15.)[2] The program description further explains that, once Minnesota Life issues coverage, the "premium payment will be conveniently added to your monthly mortgage payment" (Docket Entry 22-1 at 16).

Per the affidavit of Laura McPherson, Mr. McPherson's widow, after she and Mr. McPherson discussed the program, they "decided to obtain the coverage and . . . , on December 4, 2006, submitted an application." (Id. at 3; see also id. at 18.)[3] Ms. McPherson avers that she and Mr. McPherson were "swayed" to apply by the low premiums and the process by which "the premium would be added to [their] mortgage payment." (Id. at 3.) Of note, the application itself states: "Monthly Premium: $17.76." (Id. at 18 (emphasis added).) Minnesota Life subsequently approved Mr. McPherson's application, and, as represented, the premium was added to his monthly mortgage payment. (See Docket Entry 22-1 at 20; Docket

---

[1] The loan provided by SunTrust related to the purchase of a piece of real property in Liberty, North Carolina. (Docket Entry 3, ¶ 3.) Although the Complaint states that "[Ms. McPherson] and [Mr.] McPherson are owners by the entireties of that real property," (id.), "[t]he note on the loan . . . is solely in the name of [Mr.] McPherson" (id.).

[2] Page citations refer to pagination in the CM/ECF footer.

[3] Mr. McPherson submitted the application solely in his name. (See Docket Entry 22-1 at 18.)

-2-

Entry 19-1 at 3.)  The policy issued by Minnesota Life (the "Policy") became effective in December 2006.  (See Docket Entry 19-2 at 3; Docket Entry 19 at 2.)[4]

The Policy declares that Mr. McPherson was "required to make monthly premium payments to keep th[e] [P]olicy in force."  (Docket Entry 19-2 at 13.)  It also provides for a "31-day grace period" by stating that, "[i]f a premium is not paid on or before the date it is due, it may be paid during the following 31-day period" and that the Policy "will continue in force during this 31-day period." (Id.)  Under the section entitled "Termination," the Policy states:

> This [P]olicy will terminate on the earliest of:
>
> (1) the date any premium due for this [P]olicy remains unpaid at the end of the grace period; or
> (2) the expiration of the term of insurance for this [P]olicy; or
> (3) the date we receive your request to terminate this [P]olicy; or
> (4) the date of your death.

(Id. at 14.)  In addition, the Policy precludes any change or waiver of the Policy's provisions "unless made in writing by [Minnesota Life] and signed by [Minnesota Life's] president, vice president, [] secretary or an assistant secretary."  (Id. at 12.) Accordingly, "[n]o agent or other person ha[d] the authority to change or waive any provision of [the] [P]olicy."  (Id.)

---

[4] Minnesota Life's brief in support of its instant Motion states that the Policy became effective on December 28, 2006.  (See Docket Entry 19 at 2.)  An affidavit attached to that brief states that the Policy became effective on December 8, 2006.  (See Docket Entry 19-2 at 3.)  The Policy itself does not appear to identify an effective date.  (See id. at 11-16.)

-3-

In August 2007, SunTrust sent Mr. McPherson a notice advising him of the transfer of the servicing of his mortgage to Chase Home Finance, LLC ("Chase"). (Docket Entry 22-1 at 25.) That notice states: "If you currently have mortgage life or disability insurance on your loan[,] this coverage will continue unless otherwise notified." (Id. (emphasis added).) Nothing in SunTrust's foregoing notice, however, addresses the method of premium payment after the mortgage servicing transfer. (See id.) The Complaint alleges that, "[a]fter the transfer of the loan to Chase, [Mr.] McPherson continued making the same monthly loan payments, including the additional $17.76 [premium payment], that he had been making to SunTrust." (Docket Entry 3, ¶ 5.) However, in connection with its instant Motion, Minnesota Life submitted evidence that the premium payment was no longer included in Mr. McPherson's mortgage payment after the transfer to Chase. (Compare Docket Entry 19-1 at 7, with Docket Entry 19-4 at 5-6.) Plaintiffs do not contest this point in their Response. (See Docket Entry 22.) Additional undisputed evidence further confirms that Minnesota Life last received a premium payment on August 1, 2007 – as part of the final monthly mortgage payment due to SunTrust prior to the transfer to Chase. (See Docket Entry 19-2 at 6.)

By way of letter dated September 4, 2007, Minnesota Life notified Mr. McPherson that his "premiums for the [mortgage accidental death insurance] coverage can no longer be collected with [his] mortgage payment." (Docket Entry 22-1 at 33.) That same letter states:

> Please note that your coverage is terminated. But if you would like to reactivate your insurance we must receive your quarterly premium while you are still living and by [October 4, 2007]. You must continue to pay your quarterly premium amount directly to Minnesota Life in order to keep coverage in force.

(Id.) The foregoing letter was signed by Susan Budelis, who was identified as a "Licensed Agent" in said letter (id.) and as "Manager, Sales, Service & Administration" in an affidavit attached to Minnesota Life's instant Motion (Docket Entry 19-2 at 2). (Docket Entry 22-1 at 33.) Through that attached affidavit, Ms. Budelis also averred that Minnesota Life subsequently sent Mr. McPherson a follow-up notice dated October 24, 2007. (Docket Entry 19-2 at 5.) According to Ms. McPherson's affidavit, however, she and Mr. McPherson "never received [either the September 4, 2007, or October 24, 2007,] notifications." (Docket Entry 22-1 at 4-5.)

Mr. McPherson died as a result of a motor vehicle accident on July 18, 2008. (Docket Entry 22-1 at 10.) On June 2, 2011, Ms. McPherson, by way of her attorney, sent a letter to Minnesota Life "asserting her claim for payment" under the Policy. (Id. at 28.) Minnesota Life responded:

> We understand that Mr. McPherson passed away on July 18, 2008. There was no active coverage in effect with our Company on the date of his death. Therefore, we are not able to consider a claim for benefits presented on his behalf.

(Id. at 32.)

Plaintiffs thereafter initiated this action alleging breach of contract and violation of North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA"). (Docket Entry 3.) Minnesota Life

-5-

subsequently moved for summary judgment (Docket Entry 18), Plaintiffs responded (Docket Entry 22), and Minnesota Life replied (Docket Entry 23).

DISCUSSION

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a genuine dispute exists if the evidence presented could lead a reasonable factfinder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In making this determination, the Court must view the evidence and any reasonable inferences therefrom in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The party moving for summary judgment may discharge its burden by identifying an absence of evidence to support the non-moving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-moving party then must "set forth specific facts showing that there is a *genuine issue for trial*." Matsushita Elec. Indus., 475 U.S. at 586–87 (citation omitted) (emphasis in original). In this regard, the non-moving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 252 (citation omitted); see also Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a

-6-

summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

To the extent the Court must draw conclusions about matters of North Carolina law in evaluating the instant Motion, "the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." West v. American Tel. & Tel. Co., 311 U.S. 223, 236 (1940). However, "[a] state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them." Id.

Accordingly, "it is the duty of [a federal court facing a question of state law] to ascertain from all the available data what the state law is and apply it . . . ." Id. at 237. "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Id.

*A. Breach of Contract*

The evidence before the Court, viewed in the light most favorable to Plaintiffs, demonstrates that no genuine issue of material fact exists and that Minnesota Life has shown entitlement

-7-

to judgment as a matter of law on Plaintiffs' breach of contract claim. Under North Carolina law, a breach of contract claim requires proof of "(1) the existence of a valid contract and (2) breach of the terms of the contract." Long v. Long, 160 N.C. App. 664, 668, 588 S.E.2d 1, 4 (2003). In the insurance context, "'[u]nless the payment of premium is waived, it is a condition precedent to insurance coverage.'" Nationwide Mut. Ins. Co. v. Choice Floor Covering Co., 112 N.C. App. 801, 806, 436 S.E.2d 851, 854 (1993) (quoting Engelberg v. Home Ins. Co., 251 N.C. 166, 168, 110 S.E.2d 818, 820 (1959)). Because the record undisputedly shows nonpayment of the premiums owed under the Policy in the ten-month period prior to Mr. McPherson's death, Plaintiffs cannot meet their burden of proving the existence of a valid contract.

Plaintiffs contend that North Carolina law required Minnesota Life to send appropriate notice prior to terminating the Policy and, because they never received such notice, the Policy remained in force. (See Docket Entry 22 at 11-13.) Specifically, Plaintiffs point to a North Carolina statute, which states in relevant part:

> No life insurance corporation doing business in this State shall, within one year after the default in payment of any premium . . . , declare forfeited or lapsed any policy hereafter issued or renewed, except policies on which premiums are payable monthly or at shorter intervals . . . , nor shall any such policy be forfeited or lapsed by reasons of nonpayment, when due, of any premium . . . required by the terms of the policy to be paid, within one year from the failure to pay such premium . . . , unless a written or printed notice stating the amount of such premium . . . due on such policy, the place where it shall be paid, and the person to whom the same is payable has been duly addressed and

-8-

Case 1:11-cv-00666-TDS-LPA   Document 24   Filed 11/20/12   Page 8 of 15

>     mailed, postage paid, to the person whose life is insured
>     . . . .

N.C. Gen. Stat. § 58-58-120.

Despite Plaintiffs' contentions, Section 58-58-120 does not apply in this context. The Policy explicitly notes that the insured is "required to make <u>monthly</u> premium payments to keep this [P]olicy in force." (Docket Entry 19-2 at 13 (emphasis added).) Because the statute on which Plaintiffs rely excepts "policies on which premiums are payable <u>monthly</u> or at shorter intervals," N.C. Gen. Stat. § 58-58-120 (emphasis added), Minnesota Life did not have to comply with the notice provisions of said statute.

Plaintiffs urge a different result by pointing to the letter sent by Minnesota Life on September 4, 2007, which provides that, if Mr. McPherson "would like to <u>reactivate</u> [his] insurance[,] [Minnesota Life] must receive [his] <u>quarterly</u> premium while [he is] still living and by [October 4, 2007]." (Docket Entry 22-1 at 33 (emphasis added).) The quarterly premiums referenced apply to an offer for a "reactivated" policy under new terms (<u>id.</u>), as to which Mr. McPherson, who Plaintiffs contend did not receive the letter containing that offer (<u>see</u> <u>id.</u> at 4-5), took no action. Moreover, nothing in the Policy permits alteration of the premium payment provisions of the Policy by way of a letter signed by Ms. Budelis. (<u>See</u> Docket Entry 19-2 at 11-16.) Accordingly, the fact remains that the only valid contract for insurance coverage between

-9-

Case 1:11-cv-00666-TDS-LPA   Document 24   Filed 11/20/12   Page 9 of 15

Minnesota Life and Mr. McPherson required monthly premium payments, thereby removing it from the application of Section 58-58-120.[5]

Plaintiffs further challenge the reliance by Minnesota Life on the "monthly payment" exception contained in Section 58-58-120 on the grounds that said statute applies to forfeiture of coverage due (in relevant part) to nonpayment of premiums, whereas Plaintiffs contend Minnesota Life terminated the Policy "due to the fact it could no longer collect the premium payments out of the mortgage payments." (Docket Entry 22 at 7.) Plaintiffs' contention regarding the basis for Minnesota Life's termination of the Policy

---

[5] Minnesota Life argues that, even if Section 58-58-120 applied, it met its notice obligations via the letters addressed to Mr. McPherson dated September 4, 2007, and October, 24, 2007, which letters Ms. Budelis averred and documentary evidence showed were sent (Docket Entry 19-2, at 4-5, 20-23, 27). (Docket Entry 19 at 12-15.) Under Section 58-58-120, "[t]he affidavit of any officer, clerk, or agent of the corporation, or of anyone authorized to mail such notice, that the notice required by this section has been duly addressed and mailed by the corporation issuing such policy, shall be presumptive evidence that such notice has been duly given." In an effort to rebut this presumption, Ms. McPherson avers that she and Mr. McPherson "never received any such notifications." (Docket Entry 22-1 at 4.) She also offers: (1) that the mail carrier at the address in question "changed quite frequently" (id. at 5), that "[t]here have been occasions where, by mistake, [the McPhersons] received mail belonging to a neighbor" (id.) and accordingly "a neighbor might have received the mail from Minnesota Life intended for [them] and failed to either get the mail to [them] or to take steps to have the mail returned to Minnesota Life" (id.); and (2) that she knew Mr. McPherson "to be diligent in obtaining and maintaining life and accidental death insurance coverage to protect his family and businesses" (id.) and, thus, "it is [her] full belief that, had [Mr. McPherson] had any notification that his coverage through Minnesota Life had been terminated or was going to be terminated because of the premium payments no longer being made as part of [their] mortgage payments, he would have done whatever it took to renew or reinstate the coverage" (id.). Because Section 58-58-120 does not apply, the Court need not address these issues.

appears to relate to the timing of the letter dated September 4, 2007. According to the affidavit of Ms. Budelis, "Mr. McPherson's last premium payment was received from SunTrust by Minnesota Life on August 1, 2007." (Docket Entry 19-2 at 6.) It thus appears that Mr. McPherson's next monthly payment would have come due on September 1, 2007. Because the Policy provides for a "31-day grace period" for the payment of premiums (id. at 13), termination for nonpayment of premiums could not occur until early October 2007 (see id. at 14).

Plaintiffs thus argue that, in light of the language in the letter from Minnesota Life dated September 4, 2007, stating that the Policy was terminated, "by the time [Mr. McPherson] could have been in default on his premium payments, coverage under the Policy had already been terminated." (Docket Entry 22 at 7.) If the Court accepted Plaintiffs' argument that Minnesota Life terminated the Policy for grounds not addressed in Section 58-58-120, the entirety of said statute, including the language on which Plaintiffs rely, would lack applicability. In other words, Section 58-58-120 only requires policies to remain in effect for an additional year after termination without notice when such termination results from nonpayment.

Plaintiffs' related argument - that Minnesota Life acted wrongfully by purporting to terminate the Policy on September 4, 2007, because "there is no provision allowing Minnesota Life to terminate on the ground of no longer being able to collect the premium payments out of the mortgage payments" (Docket Entry 22 at

-11-

7-8) - similarly provides no grounds to deny Minnesota Life summary judgment on Plaintiffs' breach of contract claim. Even if the Court found that no termination could have occurred as of September 4, 2007, by its express terms, the Policy did terminate for nonpayment in October 2007, prior to Mr. McPherson's death. See, e.g., Rivers v. State Capital Life Ins. Co., 245 N.C. 461, 465, 96 S.E.2d 431, 435 (1957) ("It is generally understood that the nonpayment of a premium when due, or within the period of grace thereafter, in the absence of some extension or waiver, automatically avoids a policy of insurance." (internal quotation marks and citation omitted)); see also Bank of Okla. v. Monumental Life Ins. Co., 230 F. App'x 788, 791 (10th Cir. 2007) ("[A]ny possible coverage under the [p]olicy surely terminated no later than the expiration of the 31-day grace period . . . . Simply put, because [the insured] failed to make a payment [within the 31-day grace period], any coverage that might have once existed certainly ceased by that date."). As a result, no reasonable factfinder could conclude that the Policy remained in effect at the time of Mr. McPherson's death as required to sustain a breach of contract claim.

*B. UDTPA*

Plaintiffs' second claim - violation of North Carolina's UDTPA (see Docket Entry 3, ¶¶ 13-18) - meets a similar fate. "[A UDTPA] claim under [North Carolina law] requires proof of three elements: (1) an unfair or deceptive act or practice, or an unfair method of competition, (2) in or affecting commerce, (3) proximately causing

actual injury to plaintiff or plaintiff's business." AG Sys., Inc. v. United Decorative Plastics Corp., 55 F.3d 970, 974 (4th Cir. 1995) (internal brackets and quotation marks omitted); accord Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001). "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145, 148 (4th Cir. 1987) (citing Marshall v. Miller, 302 N.C. 539, 276 S.E.2d 397, 403 (1981), and Overstreet v. Brookland, Inc., 52 N.C. App. 444, 452-53, 279 S.E.2d 1, 7 (1981)). "[T]he determination of whether a particular action constitutes an unfair or deceptive trade practice is a question of law." South Atl. Ltd. P'ship of Tenn., L.P. v. Riese, 284 F.3d 518, 529 (4th Cir. 2002); see also Gray v. North Carolina Ins. Underwriting Ass'n, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000) ("Ordinarily, once the jury has determined the facts of a case, the court, based on the jury's findings, then determines as a matter of law, whether the defendant engaged in unfair or deceptive practices in or affective commerce.").

Plaintiffs contend:

> Minnesota Life's failure to advise [Mr. McPherson] of the possibility of termination of the Policy in the event the loan is transferred to another lender and premiums are no longer collectible out of the mortgage payments, terminating the Policy without notice once the loan was, in fact, transferred and then post facto attempting to assert invalid facts and defenses to avoid its death benefit obligations to [Mr. McPherson's] widow constitute an unfair and deceptive trade practices [sic] under North Carolina law.

(Docket Entry 22 at 7.)

-13-

As an initial matter, because Plaintiffs cannot establish that Minnesota Life breached the terms of the Policy, their claim for unfair and deceptive trade practices also fails as a matter of law. See, e.g., Rogers v. Unitrim Auto and Home Ins., 388 F. Supp. 2d 638, 643 (W.D.N.C. 2005) ("Having concluded [] that even in the light most favorable to the [p]laintiffs, their loss was excluded from coverage under [the insurance policy], their claim for unfair and deceptive trade practices must also necessarily fail."). Moreover, the record does not support a conclusion that Minnesota Life acted in an "unethical or unscrupulous" manner or that its actions "had a tendency to deceive," Polo Fashions, 816 F.2d at 148. To the contrary, the record shows that Minnesota Life sent a timely notice to Mr. McPherson informing him that his mortgage payments would no longer cover his insurance premium and offering Mr. McPherson the ability to continue his coverage by other means. (See Docket Entry 22-1 at 33-34.) The record also establishes that, after Chase assumed the servicing of his mortgage, Mr. McPherson did not pay the required insurance premiums. (See Docket Entry 19-2 at 6.) In addition, because Plaintiffs deny that Mr. McPherson received the letter from Minnesota Life dated September 4, 2007, that included the proposal for quarterly premium payments (Docket Entry 22-1 at 5), Plaintiffs cannot argue that said letter misled Mr. McPherson regarding the payment provisions of the Policy (and/or the applicability of Section 58-58-120). Under these circumstances, Minnesota Life has established its entitlement to judgment as a matter of law on Plaintiffs' UDTPA claim.

CONCLUSION

The evidence before the Court, taken in the light most favorable to Plaintiffs, demonstrates that the Policy underwritten by Minnesota Life terminated upon nonpayment of required premiums before the date of Mr. McPherson's death. Moreover, the record establishes that Minnesota Life did not engage in unfair and deceptive practices regarding the Policy.

**IT IS THEREFORE RECOMMENDED** that Defendant's Motion for Summary Judgment (Docket Entry 18) be granted and that judgment be entered in favor of Defendant.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

November 20, 2012